PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-3824
_____

STUDENT DOE 1, BY AND THROUGH HIS PARENTS/GUARDIANS DOES 1 AND 2; STUDENT DOE 2, BY AND THROUGH HER PARENT/GUARDIAN DOE 3; STUDENT DOES 3 AND 4, BY AND THROUGH THEIR PARENT/GUARDIAN DOE 4; STUDENT DOE 5, BY AND THROUGH HIS PARENTS/GUARDIANS DOE 5; STUDENT DOE 6, BY AND THROUGH HIS PARENTS/GUARDIANS DOES 6 AND 7; STUDENT DOE 7, BY AND THROUGH HIS PARENT/GUARDIAN DOE 8; STUDENT DOES 8 AND 9, BY AND THROUGH THEIR PARENTS/GUARDIANS DOES 9 AND 10,
Appellants

v.
LOWER MERION SCHOOL DISTRICT

_____

APPEAL FROM AN ORDER ENTERED BY THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Civ. Action No. 2:09-cv-02095)
District Judge: Honorable Michael M. Baylson

_____

Argued on April 28, 2011
_____

Before: GREENAWAY, JR., ROTH, Circuit Judges, and HAYDEN,[1] District Judge

(Opinion Filed: December 14, 2011)

_____

[1] The Honorable Katharine S. Hayden, United States District Judge for the District of New Jersey, sitting by designation.

————————

David G. C. Arnold (argued)
920 Matsonford Road
West Conshohocken, PA 19428
        *Counsel for Appellants*

Judith E. Harris (argued)
Morgan, Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103
        *Counsel for Appellee*

Christopher M. Arfaa
Littleton Joyce Ughetta Park & Kelly
150 North Radnor Chester Road Suite F-200
Radnor, PA 19087
        *Counsel for Amicus Curiae Earl M. Maltz*

Joshua I. Civin
Kimberly A. Liu
NAACP Legal Defense & Educational Fund
1444 I Street, N.W. 10th Floor
Washington, DC 20005
        *Counsel for Amicus Curiae NAACP Legal Defense & Educational Fund, Lawyers*
        *Committee for Civil Rights Under Law, ACLU Foundation*

Erin H. Flynn (argued)
Mark L. Gross
United States Department of Justice Civil Rights Division, Appellate Section
P.O. Box 14403
Ben Franklin Station
Washington, DC 20044
        *Counsel for Amicus United States of America*

—————————

OPINION OF THE COURT
—————————

GREENAWAY, JR., <u>Circuit Judge</u>.

This case involves school redistricting in Lower Merion, Pennsylvania and allegations that the implemented redistricting plan violates the Equal Protection Clause. Here, the Lower Merion School District (―the District‖) used pristine, non-discriminatory goals as the focal points of its redistricting plan, Plan 3R. The District‘s goals included that:

1. ―The enrollment of the two high schools and two middle schools will be equalized;‖
2. ―Elementary students will be assigned so that the schools are at or under the school capacity;‖
3. ―The plan may not increase the number of buses required;‖
4. ―The class of 2010 will have the choice to either follow the redistricting plan or stay at the high school of their previous year;‖ (referred to as ―grandfathering‖) and
5. ―Redistricting decisions will be based upon current and expected future needs and not based on past practices.‖

(App. at A16.)

The District Court concluded that the District‘s assignment plan employing these goals required strict scrutiny because race was a factor in the formation of the plan, but concluded that the plan is constitutional because it does not use race impermissibly. Upon review, we disagree with the District Court‘s determination that strict scrutiny is the appropriate level of review, but we affirm the conclusion that the District‘s school

3

assignment plan is consonant with the Constitution.

The Supreme Court and this Court have yet to set forth any standard requiring the application of strict scrutiny when decisionmakers have discussed race, but the school assignment plan neither classifies on the basis of race nor has a discriminatory purpose. We hold that the plan here passes constitutional muster because it does not select students based on racial classifications, it does not use race to assign benefits or burdens in the school assignment process, it does not apply the plan in a discriminatory manner, and it does not have a racially discriminatory purpose. Strict scrutiny does not apply. The appropriate test to determine the constitutionality of the District's school assignment plan is rational basis. In our view, the District has met the rational basis test with its redistricting plan — Plan 3R. We shall affirm the District Court's order.

## I. BACKGROUND

The District operates six elementary schools (Belmont Hills, Cynwyd, Gladwyne, Merion, Penn Valley, and Penn Wynne); two middle schools (Bala Cynwyd and Welsh Valley); and two high schools (Harriton and Lower Merion High School (―LMHS‖)). The high schools are both ―ranked as being among the best in the state, if not the nation.‖ (App. at A6.) Nine elected School Directors (―Board members‖) comprise the Lower Merion Board of School Directors (―Board‖), which has the authority to assign Lower

4

Merion students to schools within the District.[2]  The District's Administration includes

the District's Superintendent and several cabinet members.[3]

In 1997, the District began a capital improvement program to modernize each

District school.  In May 2004, a forty-five member Community Advisory Committee

("CAC") of school officials and community members investigated a plan to modernize

the two high schools.  At the time, approximately 1600 students attended LMHS and 900

students attended Harriton.  The CAC considered four proposals: (1) creating a separate

school for grade nine only and another school for grades ten through twelve; (2) building

one new high school that all high school students would attend; (3) building two new

high schools to replace Harriton and LMHS with the same student populations as

Harriton and LMHS; and (4) building two new high schools with 1,250 students enrolled

at each school.

The CAC rejected the first three proposals due to academic and logistical

shortcomings.  The CAC voted in favor of the fourth proposal (building two high schools

with equal student enrollment) because students would benefit from a stronger sense of

---

[2] During the January 2009 school redistricting process, the Board members were: Diane DiBonaventuro; Linda Doucette-Ashman; David Ebby, the President; Gary J. Friedlander; Susan Guthrie; H. Linda Kugel; Ted Lorenz; Gerald Gene Novick; and Lisa Pliskin.

[3] Dr. Christopher McGinley was the District's Superintendent, beginning in June 2008, and Dr. Jamie P. Savedoff was his predecessor.  During the school redistricting process, Dr. McGinley's cabinet included Dr. Michael J. Kelly, Assistant Superintendent; Edward Andre, Director of Transportation; Scott A. Schafer, Business Manager; Pat Guinnane, Director of Human Resources; and Doug Young, Director of Public Relations.

community, better student-faculty interactions, and better educational outcomes. The CAC also determined that this option would give students at both high schools the most equitable access to programs and facilities while securing the best use of both school sites. This option would also alleviate traffic and parking problems near LMHS.

The Board accepted the CAC's recommendation to equalize the student populations at the two high schools and chose to keep the schools at their existing locations because the District did not have other possible sites. Equalizing student enrollment between the two schools would require redistricting because, under the prior plan, LMHS had 700 more students than Harriton. Harriton, which is located farther from the center of the student population than LMHS, has always had a substantially lower enrollment than LMHS despite Harriton's magnet programs aimed at attracting more students.

Students Doe 1 through 9 (―Stdents") are African-American students who live in an area referred to as South Ardmore or the Affected Area, which is within the District. Ardmore, which is comprised of North Ardmore and South Ardmore, is a neighborhood in Lower Merion. Six of the Parents Doe testified that they and their children live within a mile of LMHS and the District's Director of Transportation, Michael Andre, testified that at least three Students Doe live within a mile of LMHS. Of the neighborhoods in the

District, the Affected Area and North Ardmore have the highest concentration of African-American families.[4]

Decades before this litigation, the District assigned students who lived in North Ardmore and the Affected Area to an elementary school in Ardmore. After that elementary school was torn down, the District assigned students in North Ardmore and the Affected Area to five of the District's other elementary schools and the District provided bus service to those schools. In the 1990s, the District reassigned students of North Ardmore and the Affected Area: North Ardmore students attended Penn Wynne Elementary School and Bala Cynwyd Middle School; Affected Area students attended Penn Valley Elementary School and Welsh Valley Middle School. During that time, students in both North Ardmore and the Affected Area could choose to attend either Harriton High School or LMHS.

Prior to the adoption of Plan 3R, the plan at issue here, students assigned to Belmont Hills, Gladwyne, and Penn Valley Elementary Schools would attend Welsh Valley Middle School and then would attend Harriton for high school, with the exception that students who lived in the Narberth Borough area, Haverford, and the Affected Area were assigned to LMHS. Students assigned to Cynwyd, Merion, and Penn Wynne

---

[4] As of September 2008, the Affected Area had 308 students in kindergarten through twelfth grade (140 were white, 140 were African-American, 9 were Asian, and 18 were Hispanic) and North Ardmore had 167 students in kindergarten through twelfth grade (32 were white, 107 were African-American, 12 were Asian, and 16 were Hispanic). (App. at A10 n.2 (citing Plaintiff's Exhibit 154, ¶¶ 13–14).)

Elementary Schools would attend Bala Cynwyd Middle School and, then, were assigned to LMHS for high school. All students assigned to LMHS could, instead, choose to attend Harriton. Prior to redistricting, forty-six African-American students attended Harriton (5.7 percent of Harriton's total student population) and ten percent of the District's high school students were African-American. (App. at A13.)

The District has always provided bus service to students except those students who live in the ―walk zones‖ of the school that they attend. Walk zones are the areas within a mile of District Schools.[5] Students who live within a walk zone for their assigned school walk to school instead of receiving bus service. The boundaries of the LMHS walk zone were selected in the late 1990s. Because the Pennsylvania Department of Transportation declared that the street on which Harriton is located is hazardous for student walking, Harriton is the only school without a walk zone.

## A. Redistricting

The redistricting process began in the summer of 2008 and ended on January 12, 2009, when the Board adopted Proposed Plan 3R. Initially, the Board authorized the Administration to develop proposed redistricting plans and to choose plans for the Board's consideration. The Board also developed a list of ―Non-Negotiables‖ to guide

---

[5] The historic LMHS walk zone does not extend to all of the area within a mile of LMHS. Appellants have not challenged the constitutionality of the historic LMHS walk zone boundaries.

the redistricting process.[6] On April 21, 2008, the Board adopted the following Non-Negotiables:

1. "The enrollment of the two high schools and two middle schools will be equalized;"
2. "Elementary students will be assigned so that the schools are at or under the school capacity;"
3. "The plan may not increase the number of buses required;"
4. "The class of 2010 will have the choice to either follow the redistricting plan or stay at the high school of their previous year;" (referred to as "grandfathering") and
5. "Redistricting decisions will be based upon current and expected future needs and not based on past practices."

(Id. at A16.)

In May 2008, the District hired two outside consultants, Dr. Harris Sokolov and Ellen Petersen, to compile a list of Lower Merion residents' values for the purpose of informing the redistricting process. As a result of a series of public forums and a collection of online surveys from Lower Merion residents, information was gathered and all had an opportunity to participate.

The consultants issued a report identifying the following "Community Values":

1. "Social networks are at the heart of where people live, and those networks expand as people grow older;"
2. "Lower Merion public schools are known for their excellence: academic as well as extracurricular;"
3. "Those who walk should continue to walk while the travel time for non-walkers should be minimized;"

---

[6] The Administration recommended several Non-Negotiables to the Board. One of the Administration's suggestions was to address the "distribution of minority students" and "racial balanc[ing]." (App. at A15.) The Board did not accept this suggestion.

9

4. ―Children learn best in environments when they are comfortable — socially as well as physically;" and
5. ―[E]xplore and cultivate whatever diversity — ethnic, social, economic, religious and racial — there is in Lower Merion."

(Id. at A17, n.9.)[7]

In June 2008, the Board hired Dr. Ross Haber to review and analyze District enrollment data and to create redistricting plans called ―Scenarios."

Dr. Haber prepared eight sets of Scenarios[8] that were considered by the Administration, in the first instance. Under the Scenarios, the projected enrollment for Harriton ranged from 1080 to 1195 and the projected enrollment for LMHS ranged from 1137 to 1270. Both the Affected Area and North Ardmore would be redistricted to Harriton in Scenarios 1, 2, and 5; the Affected Area, but not North Ardmore, would be redistricted to Harriton in Scenario 8; North Ardmore, but not the Affected Area, would be redistricted to Harriton in Scenarios 3, 4, and 7; and neither the Affected Area nor North Ardmore would be redistricted to Harriton in Scenario 4a. No Scenario redistricted only the Affected Area to Harriton. The percentage of students at each high school that would be African-American ranged from 4.4 percent to 14.5 percent under the Scenarios.

---

[7] Dr. Ross Haber, who developed the redistricting plans, testified that he was aware of and used the Community Values in developing the plans.

[8] The Scenarios are numbered 1, 2, 3, 4, 4a, 5, 7, and 8. No Scenario 6 was ever presented to the Administration.

10

Most Scenarios would yield a percentage of African–American students between 7 and 10 percent.[9]

Dr. Haber prepared informational handouts of the Scenarios for the Administration. The handouts regarding Scenarios 1, 2, 3, 4, and 5 included the number of African-American students, but did not include any other racial/ethnic data or any data regarding socioeconomic status or disability.[10] Dr. Haber reported data on race, ethnicity, and socioeconomic disability for Scenarios 4a, 7, and 8. The summaries of the Scenarios on the District's website did not include the statements regarding the racial/ethnic numbers for each Scenario. Dr. Haber testified[11] that this information was probably reported because the Administration expressed concerns regarding African-American students and that he was never directed to create or change a Scenario based on diversity outcomes.[12] A chart dated August 26, 2008 lists the African-American and

---

[9] The percentage of the Harriton student population that would be African-American is, in ascending order: Scenario 4a, 4.4 percent; Scenario 7, 7.8 percent; Scenarios 4 and 5, 8.6 percent; Scenario 2, 9.3 percent; Scenario 8, 9.6 percent; Scenario 3, 9.9 percent; and Scenario 1, 14.5 percent.

[10] On his personal set of the handouts, Dr. McGinley wrote by hand the projected African-American student populations for Scenarios 1, 2, and 3. For Scenarios 3, 3a, 4, and 5, the African-American student projections appear under the heading ―racial balance."

[11] This refers to Dr. Haber's testimony on April 12, 2010 during the District Court bench trial.

[12] Dr. McGinley was aware of the Supreme Court's decision in Parents Involved in Community Schools v. Seattle School District No. 1, 551 U.S. 701 (2007) (―Seattle"),

11

socioeconomically disadvantaged population estimates for the Scenarios.[13]  The

following day, the chart was updated to include additional, general diversity data.

The Administration considered Scenarios 1, 2, 3, 4, 4a, and 5 before eliminating

Scenarios 1 and 4a.  Drs. McGinley and Haber testified that Scenario 1 was ―eliminated

due to inequitable racial balancing" — this Scenario redistricted both the Affected Area

and North Ardmore to Harriton.  (Id. at A24.)  Additionally, Scenario 1 was eliminated

because it violated the Non-Negotiable to equalize the high school population and it

would result in longer travel times.  Scenario 4a was eliminated because it ―[d]oes not

support the community value of diversity as does other scenarios."  (Id.)  Scenario 4a is

the only considered Scenario that redistricted neither North Ardmore nor the Affected

Area to Harriton.  Dr. McGinley crossed out his copy of the slide presenting diversity

data under Scenario 4a and wrote, ―Don't present."  (Id. at A30.)  He also wrote, ―So

don't post," next to the slide listing reasons for not selecting Scenario 4a.  (Id.)

---

and asked Dr. Haber how the case affected a redistricting plan that sent a portion of
Ardmore students to Harriton.

[13] Dr. McGinley wrote by hand on his personal copy of the chart the population for other
racial and ethnic groups and the number of special needs students under Scenario 3.
Additionally, on his copy of the chart, Dr. McGinley handwrote ―OK" next to the
numbers of African-American students and socioeconomically disadvantaged students for
Scenario 4b.

B. **Proposed Plans**

      i.  <u>Proposed Plan 1</u>

After considering Scenarios 1, 2, 3, 4, 4a, and 5, the Administration presented Proposed Plan 1, which was based on the Scenario 3 series, to the Board at a public meeting on September 8, 2008. Under Proposed Plan 1, there was no redistricting at the elementary school level and high school districting was determined by where the student lived. Under this plan, students remained with the same group of students from kindergarten through grade eight. The projected student enrollment of Harriton was 1108 and that of LMHS was 1137. Under Proposed Plan 1, North Ardmore, along with all of Penn Wynne Elementary School and some areas of Penn Valley Elementary School, would be redistricted for Harriton while the Affected Area would be districted for LMHS. Proposed Plan 1 was projected to result in African-American students accounting for 9.9 percent of Harriton's student population. Any high school student could still choose to attend Harriton to enroll in the school's International Baccalaureate Program.[14] Under the plan's grandfathering provision, all current high school students could choose to remain at the high school they attended when the plan went into effect.

The slide show presentation for Proposed Plan 1 included a slide with student population information on race/ethnicity, socioeconomic status, and disability. A press release regarding this plan initially included a sentence stating that enrollments would

---

[14] This is a specialized academic program for a limited number of students.

13

reflect ―balance with regard to students of various ethnic, socio-economic, and special needs backgrounds," but that sentence was removed prior to publication. (Id. at A29.) After Proposed Plan 1 was presented at the public meeting, the District did not include the number of African-American students that would attend each high school when it posted Dr. Haber's summaries of the Scenarios on the District's website. Dr. McGinley had asked Doug Young, the Director of Public Relations, not to post that information.

On September 19, 2008, Board Member Diane DiBonaventuro sent an email to Dr. McGinley explaining that people might have ―the perception that Harriton is completely homogenous," attended by ―filthy [rich] spoiled white kids." (Id. at A31.) She also stated that the Board should emphasize that it is not merely trying to increase Harriton's racial diversity and the Board ―should be selling both our schools to the community." (Id.)

Board Member David Ebby responded to an email from a concerned citizen by saying that ―diversity is looked at in total," and that Dr. McGinley ―is not trying to use the diversity of the Penn Wynne elementary attendance area to benefit a homogenous group in the western end of the Township by making their school more diverse." (Id.)

After receiving comments regarding the plan, the Board rejected Proposed Plan 1 because it resulted in excessive travel times for students.

14

ii.  Proposed Plan 2

After the Board rejected Proposed Plan 1, the Administration considered the Scenario 7 series.  Scenario 7C, which Dr. McGinley stated was ―more consistent with the non-negotiables and the community values," was modified to become Proposed Plan 2.  (Id. at 32.)  Under the plan, the projected student enrollment of Harriton was 1135 and that of LMHS was 1139.  Proposed Plan 2 determined high school districting based on where the student lived.  The only students who could choose which high school to attend were those districted for LMHS but who chose to attend Harriton to enroll in the school's IB program.  Under this plan, students remained with the same group of students from kindergarten through grade eight, then they were separated for high school.  Under Proposed Plan 2, North Ardmore, along with all of Penn Wynne Elementary School, some areas of Penn Valley Elementary School, Narberth Borough of Belmont Hills, and some areas of Merion, would be redistricted for Harriton while the Affected Area would be districted for LMHS.  Proposed Plan 2 was projected to result in African-American students accounting for 7.8 percent of Harriton's student population.

On October 28, 2008, Proposed Plan 2 was presented at a Board meeting open to the public.  Instead of adopting Proposed Plan 2, the Board asked Petersen and Dr. Sokolov, who had compiled a report of the Community Values in May 2008, to reassess the factors that were important to the community in a redistricting plan.  During this period of time, the Board thought that the community's primary concern was educational

continuity in terms of keeping students who attended the same kindergarten together at the same elementary, middle, and high schools through grade twelve. The Board also identified additional goals of distance, access, and walkability.

### iii. Proposed Plan 3

Next, the Administration developed Scenario 8, which would later become Proposed Plan 3.[15] Before Proposed Plan 3 was selected and presented publicly, all of the Board members saw Scenario 8 and some individual Board members discussed race when speaking to others about potential proposals.[16]

---

[15] At this point in the redistricting process, Dr. Haber's role was substantially diminished.

[16] Dr. McGinley sent a memorandum to the Board stating that a proposal developed by some parents "creates a racially isolated group of African American Students at Harriton." (App. at A35.) He noted that it "adds travel distance to several areas." (Id.)
    On November 6, 2008, Board member Lisa Pliskin emailed Dr. McGinley, stating that she might want to see more of the diversity data for the plan. Diane DiBonaventuro prepared a document with a new proposal and indicated that her proposal would lead to a problem of "a large population of minority students" at LMHS and that she would work racial diversity into an adopted plan if she could.
    On November 20, 2008, Dr. McGinley sent an email to Pliskin stating that he was "concerned about the Ardmore side of the map" and the "achievement gap." (Id. at A36.) He continued that he "wish[ed] there was a way to extend the option area into the [Affected Area] but doing so would not only mean another hundred at [LMHS] but many fewer A[frican]-A[merican] kids at [Harriton]." (Id.) Pliskin responded, "You are not alone in trying to solve Ardmore. I look at it every day and I know others would like to resolve it as well . . . . Can we open 100 tuition paying spots and would folks take them in this economy . . . and what happened to no racial isolation?" (Id.)
    Board Member David Ebby sent Dr. McGinley an email stating that "redistricting is an opportunity . . . to end the stereotyping of Harriton as an inferior school populated by elitists and racists." (Id. at A37.)
    DiBonaventuro sent Dr. McGinley an email about an alternative proposal she developed, noting that her proposal had "a larger population of minority students" at

16

On November 24, 2008, Proposed Plan 3 was presented at a public Board meeting. Under the plan, the projected student enrollment of Harriton was 1089 and that of LMHS was 1185. Proposed Plan 3 determined high school districting based on where the student lived. The Affected Area, along with Narberth Borough of Belmont Hills and all areas of Penn Valley Elementary School except an abbreviated LMHS walk zone, would be redistricted for Harriton while North Ardmore would be districted for LMHS. The students who lived in the abbreviated LMHS walk zone could choose to attend either high school. The only other students who could choose their high school were those who were districted for LMHS, but who chose to attend Harriton to enroll in the school's IB program. Proposed Plan 3 was projected to result in African-American students accounting for 9.6 percent of Harriton's student population.

Proposed Plan 3 was a ―3l-1 Feeder Pattern,‖ which sends the students districted for three elementary schools to attend a single middle school and a single high school. Under Proposed Plan 3, students districted for Cynwyd, Merion, and Penn Wynne Elementary Schools were districted to Bala Cynwyd Middle School and Lower Merion High School. Students districted for Belmont Hills, Gladwyne, and Penn Valley Elementary Schools were districted to Welsh Valley Middle School and Harriton High

LMHS, but that ―expanding the choice to include the [Affected Area] may help a little.‖ (Id.) DiBonaventuro also sent an email to Dr. McGinley entitled ―African American students,‖ which stated that she was ―strugling with the issue of where to place the [Affected Area] kids‖ because there were compelling arguments for districting them to LMHS, but she ―worr[ied] about the kids that would become somewhat isolated at Harriton without a higher population.‖ (Id. at A37–38.)

17

School. Under this plan, students remained with the same group of students from kindergarten through grade twelve.

Students in the Affected Area would travel eighteen to nineteen minutes by bus to attend Harriton. That ride is half the distance and half the time of the longest bus ride in the District. The slideshow for the presentation of Plan 3 included diversity data.

The Board's understanding of community members' concerns regarding Proposed Plan 3 was that there was a walkability issue due to the abbreviated LMHS walk zone. In response, the Board decided to revise the proposal to become Proposed Plan 3R, which restored the LMHS walk zone to the non-abbreviated LMHS walk zone area.

    iv.  <u>Proposed Plan 3R</u>

The main difference between Proposed Plan 3R and Proposed Plan 3 is that Plan 3R expanded Plan 3's abbreviated LMHS walk zone to the LMHS walk zone's historical boundaries. The historic LMHS walk zone did not include the Affected Area and it did not have a high concentration of African-American students. Under Proposed Plan 3R, all students assigned to LMHS and all students in the historic walk zone can choose to attend either high school. Students assigned to Harriton who do not live within the LMHS walk zone do not have the option of attending LMHS. Plan 3R still followed the 3-1-1 Feeder Pattern with students in the Affected Area, along with Narberth Borough of Belmont Hills and all areas of Penn Valley Elementary School except the historic LMHS

walk zone, redistricted for Harriton and North Ardmore districted for LMHS.[17] Plan 3R also included a grandfathering provision that allowed students who had already begun attending high school to choose to stay at that high school, even if they were assigned to the other high school under Plan 3R.

On December 15, 2008, Proposed Plan 3R was presented at a public Board meeting. Dr. McGinley testified that it was impossible to know the diversity data for Plan 3R because the grandfathering provision allowed so many students to choose to attend either high school.[18] Drs. McGinley and Haber exchanged emails regarding how to discuss the role of race in the redistricting process.[19] The presentation for Plan 3R did

---

[17] Plan 3R's 3-1-1 Feeder Pattern was the same as Plan 3's: students districted for Cynwyd, Merion, and Penn Wynne Elementary Schools were districted to Bala Cynwyd Middle School and LMHS. Students districted for Belmont Hills, Gladwyne, and Penn Valley Elementary Schools were districted to Welsh Valley Middle School and Harriton.

[18] If students attend the schools to which they are assigned under Plan 3R, one would expect the student populations of the school to be similar to those of Proposed Plan 3, where the projected student enrollment of Harriton was 1089, the projected enrollment of LMHS was 1185, and Harriton was projected to have a student enrollment that was approximately 9.6 percent African-American.

[19] Dr. Haber emailed Dr. McGinley, stating that
> [t]he issue of race is still out front. I think it is important to emphasize that you hired a consultant who had no horse in this race and the charge was simply to balance the enrollments at the high school. . . . We not only considered race when considering diversity but also socio-economic status as well as special needs considerations.

(App. at A44.) Dr. Haber testified that discussion of diversity focused on African-American students because the African-American students were ―more concentrated‖ geographically. (Id.)

not include any diversity data. Hours before the Board's vote on Plan 3R, Dr. McGinley emailed to the Board projected Plan 3R enrollment data for race and ethnicity, socioeconomic status, and disability. Dr. McGinley testified that he sent these projections in response to a flyer that alleged the plan was —artiℂially designed to create token diversity at Harriton." (Id. at A45.) Dr. McGinley explained in the email that he did not agree with the flyer and stated that —t]he community value of diversity is what caused us to look at this issue in the process. This was clearly misinterpreted in the public and the press." (Id. at A46.) Dr. McGinley continued that, of the 214 students who would be redistricted to Harriton, the 45 African-American students made up 21 percent of those students who would be redistricted under Plan 3R.[20] (Id.)

On January 12, 2009, the Board voted to adopt Plan 3R. Six Board members voted in favor of the plan, David Ebby and Diane DiBonaventuro voted against the plan, and then-Board President Lisa Pliskin indicated that she supported the plan, but could not vote because she was hospitalized. All of the Board members testified that they did not cast their vote or give their support based on race. Four of the Board members who supported the plan stated they did so primarily because they believed that the educational continuity of the 3-1-1 Feeder Pattern provided substantial benefits. Six of the Board

---

[20] Dr. McGinley testified at trial that he no longer believed that there was a way to estimate enrollment at Harriton and he no longer believed the projections in the email were accurate.

members who supported the plan indicated they did so due to the plan's educational benefits and the Administration's support for the plan.[21]

Diane DiBonaventuro, who voted against Plan 3R, sent Dr. McGinley an email stating that Proposed Plan 3R created an ―additional stressor‖ for African-American students by ―asking Ardmore kids to take one for the team,‖ when there ―just aren't a lot of A[frican]-A[merican] families.‖ (Id. at A48.) DiBonaventuro stated that she did not think it was ―worth it‖ to redistrict Ardmore in order to ―marginally increase diversity.‖ (Id.) She testified that she wanted students in the Affected Area to be able to choose which high school to attend because they live within walking distance from LMHS.

David Ebby, who voted against Plan 3R, testified that he did so because he considered the Affected Area and North Ardmore to be one community and he believed that the 3-1-1 Feeder Pattern and educational continuity allows ―stagnation‖ by not mixing students from different areas in the District. (Id. at A49.) Ebby testified that he did not believe race was ―at all relevant‖ in the redistricting process. (Id.)

---

[21] Board member Susan Guthrie, who voted in favor of the plan, made a chart of her opinions on each of the Proposed Plans. Under the chart headings ―keeps Community together,‖ Guthrie noted that Plans 1, 2, and 3 split Ardmore, ―minimize[] [b]us time and ―preserve[] [w]alkers,‖ and provide for educational continuity. (App. at A47–48.) Under a ―Diversify Ardmore‖ heading, she wrote ―Yes Divides‖ for Proposed Plans 1 and 2, wrote ―Depends Divides, but with choice?‖ for Proposed Plan 3, and wrote ―Yes Yes‖ for Proposed Plan 3R. (Id. at A47.)

21

### C. Developments After Redistricting

Plan 3R was implemented beginning with the 2009–2010 school year. During that year, the impact of redistricting was unclear because grandfathering was allowed. For 2009–2010, Harriton had a student enrollment of 897 students: according to the District's records, 740 are white, 74 are African-American, 55 are Asian-American, 23 are Hispanic-American, 5 are American Indian, and 5 are more than one race. Twenty-one students from the Affected Area were redistricted to Harriton, fourteen of whom were African-American. Twenty-three students from areas districted for Penn Valley Elementary School were also redistricted to Harriton, none of whom were African-American. Less than one-third of the students redistricted were African-Americans from the Affected Area.

### D. Students Doe Bring Lawsuit

On May 14, 2009, Students Doe 1 through 9, by and through their Parents/Guardians Doe 1 through 20, filed a complaint alleging that the District discriminated against them based on their race by adopting Plan 3R, which assigned Students Doe to Harriton. For the 2009–2010 academic year, Student Doe 4 chose to attend Harriton and all other Students Doe attended Penn Valley Elementary School or Welsh Valley Middle School.

Appellants allege that the District violated the Equal Protection Clause of the Fourteenth Amendment, 42 U.S.C. § 1981, and Title VI of the Civil Rights Act, 42

22

U.S.C. § 2000d, all pursuant to 42 U.S.C. § 1983, by discriminating against the Students Doe based on their race.

The District Court denied the District's Motion to Dismiss or, in the Alternative, for a More Definite Statement. Appellants moved for preliminary injunctive relief, seeking to restore their ability to choose to attend either high school, but they subsequently withdrew the request. After oral argument, on February 24, 2010, the District Court denied the District's Motion for Summary Judgment.

Appellants and the District filed numerous Motions in Limine, including the Appellants' Motion in Limine to Preclude the Trial Testimony of Drs. Claudia Lyles and Robert Lee Jarvis because the District had not identified these witnesses during the course of discovery. [22] The District Court granted the Appellants' Motion to Proceed

---

[22] Before the District Court, Appellants filed a brief supporting the motion and Appellees filed a brief opposing the motion. Appellants objected to the testimony of Drs. Lyles and Jarvis, who did not participate in the redistricting process, but who had worked with Dr. McGinley and had personal knowledge of his work. Appellants objected to the testimony of Drs. Lyles and Jarvis because: (1) the District did not identify the witnesses to the plaintiff in advance of discovery, thereby allegedly violating Federal Rule of Civil Procedure 26(a), and (2) the District failed to timely supplement its disclosure upon discovery of additional information, thereby allegedly violating Federal Rule of Civil Procedure 26(e). Appellants also argued that the District sought to depose these witnesses in order to introduce a new defense that the District had waived by asserting other "mutually exclusive" defenses. Appellants argued that allowing the District to, thus, "change the focus of its case" constituted a "trial by ambush." Appellants offer no case law to support their argument.

Appellants also sought to exclude the testimony of Anthony Stevenson and Wanda Anderson, but the objection to these witnesses is not at issue on appeal. The District intended to solicit testimony from Stevenson and Anderson regarding their knowledge of Dr. McGinley's work regarding the achievement gap and diversity issues.

23

Pseudonymously,[23] but denied the Motions in Limine without prejudice.  During trial, the District Court denied the renewed motion to preclude testimony of Drs. Claudia Lyles and Robert Lee.  The District Court held a nine-day bench trial.

**E.  District Court Findings of Fact and Conclusions of Law**

     i.  District Court Findings of Fact

After the close of testimony on May 3, 2010, the District Court held oral argument on the parties' proposed findings of fact and, on May 13, 2010, the District Court issued a Memorandum on Factual Findings.  In addition to the findings of fact indicated above, the District Court found that the District had a ―race-neutral goal of equalizing the student enrollment at the two high schools" and that legitimate factors[24] motivated the Administration's action.  The District Court noted that ―racial considerations were one of several motivating factors that resulted in the Administration's development of various plans," including the recommendation to adopt Plan 3R.[25]  (Id. at A54.)  This

---

[23] Thereafter, Appellants were referred to as Students Doe 1–9 and Parents Doe 1–10 instead of being referred to by their actual names.

[24] Legitimate factors that the District Court referenced include: ―helping students attain educational excellence, attaining equal student populations at the two high schools, minimizing travel time, developing the 3-1-1 Feeder Pattern, and also closing the achievement gap that the Administration perceived to exist between African–American and white students." (App. at A51.)  Additionally, the District Court concluded that the Non-Negotiables are all valid, educational purposes that are legitimate and non-discriminatory.

[25] The District Court determined that the Scenarios are of minor importance to this litigation because the four Board members who attended the Administration meeting

24

consideration of race ―went above and beyond collecting or reporting general diversity data" and the evidence reflected a specific concern about the African-American student population throughout the redistricting process. (Id.) The District Court found that ―the Administration plainly allowed racial consideration to influence what neighborhoods would be assigned to attend Harriton High School, without the choice to attend Lower Merion High School." (Id. at A52.) The District Court continued, opining that the Affected Area was ―targeted" for redistricting to Harriton, in part, because it has a high concentration of African-American students. According to the District Court, the Administration's ―intent was to achieve not only overall numeric equality, but also racial parity, between the two schools." (Id. at A53.)

The District Court rejected any allegation of invidious discrimination toward African-American students by the Administration or the Board. Moreover, the District Court noted that there were valid educational reasons for recommending and adopting Plan 3R, but that there was also a desire for racial diversity in both high schools. The District Court found that providing information at the public Board meetings for the Proposed Plans regarding race/ethnicity, socioeconomic status, and disability was not objectionable. The District Court found that some of the Board members considered diversity among other factors when considering Proposed Plans, but the Court also found

where the Scenarios were presented do not recall the Scenarios and the Scenarios were never presented to, nor voted upon by, the whole Board.

25

credible the Board members' testimony that race was not the basis of their votes on Plan 3R.[26]

## ii. District Court Conclusions of Law

On June 24, 2010, the District Court issued a Memorandum on Conclusions of Law. The Court stated that the central issue in this case is whether the District's ―targeting‖[27] of the Affected Area for redistricting to Harriton, ―in part because that community has one of the highest concentrations of African-American students in the District,‖ violates the Equal Protection Clause or Title VI of the Civil Rights Act. (App. at A65.)

In determining the appropriate level of scrutiny to apply to this equal protection challenge, the District Court concluded that Parents Involved in Community Schools v. Seattle School District No. 1, 551 U.S. 701 (2007) (―Seattle‖); Grutter v. Bollinger, 539 U.S. 306 (2003); Gratz v. Bollinger, 539 U.S. 244 (2003); Adarand Constructors v. Pena, 515 U.S. 200 (1995); City of Richmond v. J.A. Croson Co., 488 U.S. 469 (1988) (―Croson‖); and Johnson v. California, 543 U.S. 499 (2005) are not controlling here. The District Court held that the level of scrutiny applied in Seattle, Grutter, Gratz, Adarand, Croson, and Johnson is inapposite here. Specifically, strict scrutiny as applied in Seattle,

---

[26] The District Court concluded that Susan Guthrie and Diane DiBonaventuro considered race or diversity as a factor.

[27] The District Court describes this as including ―a particular geographic area [to be redistricted] due to its racial makeup.‖ (App. at A67.)

26

Grutter, Gratz, Adarand, Croson, and Johnson is not required here because each of those cases involves a policy that employs express, individual racial classifications, whereas Plan 3R does not. Plan 3R assigns students based on the neighborhood in which they reside without using individual racial classifications. The District Court noted that Plan 3R is a facially neutral redistricting plan with facially neutral guidelines, so, unlike the cases above, the action brought by Appellants does not "involve the additional difficulties posed by policies that, although facially race neutral, [may] result in racially disproportionate impact and [may be] motivated by a racially discriminatory purpose.'" (App. at A76 (quoting Adarand, 515 U.S. at 213).)

The District Court found, however, that the reasoning of Village of Arlington Heights v. Metropolitan Housing Development Corporation, 429 U.S. 252 (1977), and Pryor v. National Collegiate Athletic Association, 288 F.3d 548 (3d Cir. 2002), nonetheless require Plan 3R to be reviewed under strict scrutiny. The District Court interpreted the Pryor holding that, "a discriminatory purpose based on race" requires strict scrutiny analysis, Pryor, 288 F.3d at 562 (emphasis added), to mean that, "once race has been shown to be a motivating factor in decisionmaking, all racial classifications must survive strict scrutiny." (App. at A76 (emphasis added)). The District Court noted that it is unclear whether Pryor requires the application of strict scrutiny to student assignment plans that do not involve individual racial classifications.

27

In its analysis of Arlington Heights, the District Court interpreted the Supreme Court's holding that, "[w]hen there is a proof that a discriminatory purpose has been a motivating factor in the decision, . . . judicial deference is no longer justified," Arlington Heights, 429 U.S. at 265–66 (emphasis added), to mean that such deference is no longer justified when "race was a motivating factor." (App. at A78 (emphasis added).) The District Court noted that, under Arlington Heights, a court must "conduct a sensitive inquiry into such circumstantial and direct evidence of intent as may be available" to determine whether "invidious discriminatory purpose was a motivating factor." (App. at A78 (quoting Arlington Heights, 429 U.S. at 266) (emphasis added).)

The District Court referenced its own rejection of "any allegation[] of invidious discrimination . . . by the Administration or the Board." (App. at A79 (quoting Doe II, 2010 WL 1956585, at *28).) However, the District Court held that "the Affected Area's high concentration of African-American students factored into the District's adoption of Plan 3R" and, thus, "racial demographics . . . factored into the District's recommendation that the Board adopt the Plan." (App. at A80.) The District Court held that, because "race was a motivating factor during redistricting," it must determine "whether plan 3R would have been adopted regardless of the racial composition of the Affected Area." (Id. at A80.) The District Court also noted that "no congressional statute or Supreme Court precedent expressly provides that mere consideration of a neighborhood's racial

28

demographics in assigning students to schools constitutes decisionmaking in which race has been a motivating factor." (Id. at A80 n.8.)

Before embarking on a strict scrutiny review of Plan 3R, the District Court noted that, if the plan survived strict scrutiny, it would necessarily survive intermediate scrutiny or rational basis review. Because Plan 3R is the only plan that meets the District's "compelling educational interests" of "(a) equalizing the populations at the two high schools, (b) minimizing travel time and transportation costs, (c) fostering educational continuity, and (d) fostering walkability," the District Court held that Plan 3R is narrowly tailored and survives strict scrutiny. (Id. at A83.) The District Court held that "the mere fact that the District considered racial demographics . . . does not render the District's adoption of Plan 3R unconstitutional"; "Plan 3R would still have been adopted even had racial demographics not been considered." (Id. at A92–93.) The District Court held that the adoption of Plan 3R comports with the Equal Protection Clause. Because the prohibitions of Title VI and 42 U.S.C. § 1981 against discrimination are coextensive with the Equal Protection Clause, the District Court held that the Appellants' remaining claims must also fail. On June 25, 2010, the District Court entered judgment in favor of the District.

Students Doe filed a timely Motion for a New Trial, pursuant to Federal Rule of Civil Procedure 59, but the District Court ruled against the Motion on August 19, 2010.

Students Doe filed a timely appeal.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction over this case, pursuant to 28 U.S.C. § 1331. This Court has jurisdiction to review final decisions of the District Court, pursuant to 28 U.S.C. § 1291.

We review the District Court's conclusions of law de novo and we review its findings of fact for clear error. Lozano v. City of Hazleton, 620 F.3d 170, 181 (3d Cir. 2010) (citing McCutcheon v. Am.'s Servicing Co., 560 F.3d 143, 147 (3d Cir. 2009)).

A district court's evidentiary rulings are reviewed for abuse of discretion. United States v. Kemp, 500 F.3d 257, 295 (3d Cir. 2007). The District Court's interpretation of the Federal Rules of Evidence is, however, subject to plenary review. United States v. Brown, 254 F.3d 454, 458 (3d Cir. 2001).

## III. ANALYSIS

―Article III of the Constitution restricts the ‗judicial power' of the United States to the resolution of cases and controversies." Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, 454 U.S. 464, 471 (1982). To satisfy the Article III case or controversy requirement, a plaintiff must establish that he or she has suffered an ―injury in fact" that is both ―concrete and particularized" and ―actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal quotation marks omitted). In the equal protection context, an injury resulting from governmental racial discrimination ―accords a basis for standing only to those

30

persons who are personally denied equal treatment by the challenged discriminatory conduct." United States v. Hays, 515 U.S. 737, 744–45 (1995) (quoting Allen v. Wright, 468 U.S. 737, 755 (1984)) (internal quotation marks omitted).[28]

"[O]ne form of injury under the Equal Protection Clause is being forced to compete in a race-based system that may prejudice the plaintiff." Seattle, 551 U.S. at 719. Appellants have asserted an injury by alleging that Plan 3R is such a system. (See App. at A137 (Appellants allege in their complaint that Plan 3R "discriminates against Students Doe on the basis of race by mandating that said students attend Harriton High School because they are minorities" and "it imposes an undue burden on minority students").) That Students Doe have not alleged that, when they attend high school, they will want to attend LMHS instead of Harriton is irrelevant for purposes of standing. In Seattle, the Supreme Court held that the possibility of a child being assigned to that child's preferred school under the race-based plan at issue did "not eliminate the injury claimed." Seattle, 551 U.S. at 718–19. Because the children in Seattle lived in the

---

[28] In Allen, the Supreme Court held that the plaintiffs did not have standing in a suit against the Internal Revenue Service for its grant of tax exempt status to racially exclusive private schools, because, in part, the plaintiffs did not allege "that their children had ever applied or would ever apply for admission to any private school." Allen, 468 U.S. at 746. Plaintiffs maintained that they had "no interest whatever in enrolling their children in a private school." Wright v. Regan, 656 F.2d 820, 827 (D.C. Cir. 1981). Student Doe would be analogous to Allen if Students Doe had alleged that they did not intend to enroll in either public high school in the District. Students Doe, however, live within the District and attend the District's elementary, middle, or high schools. Thus, Allen is not controlling even though Students Doe have not alleged that they will attend LMHS if given the choice. Students Doe allege an injury in fact because they claim that they are being forced to compete in a race-based system.

district and attended elementary, middle, and high schools in the district, they asserted an imminent injury that was not speculative by claiming that they were ―being forced to compete in a race-based system that may prejudice" them. Id. Similar to the children in Seattle, Students Doe live within the District, attend District schools, and assert that the District is discriminating against them by assigning them to a school on the basis of race. Students Doe have asserted an injury that is not conjectural or hypothetical.[29]

## A. Equal Protection Clause

### i. Level of Scrutiny

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall ―deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 2. The central purpose of the Clause ―is to prevent the States from purposely discriminating between individuals on the basis of race." Shaw v. Reno, 509 U.S. 630, 642 (1993) (citing Washington v. Davis, 426 U.S. 229, 239 (1976)). A government action does not necessarily purposely discriminate merely because it is race-related. Crawford v. Bd. of Educ., 458 U.S. 527, 538 (1982) (―a distinction may exist between state action that discriminates on the basis of race and state action that addresses, in neutral fashion, race-related matters. . . . the Equal Protection Clause is not violated by the mere repeal of race-related legislation or policies that were not required by the

---

[29] That Student Doe 4 chose to attend Harriton does not render his claim moot because Student Doe 4 alleges the same injury as the other students — being assigned to a school under a discriminatory race-based system.

32

Federal Constitution"). Thus, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Antonelli v. New Jersey, 419 F.3d 267, 274 (3d Cir. 2005) (quoting City of Cuyahoga Falls v. Buckeye Cmty. Hope Found., 538 U.S. 188, 194 (2003)) (internal citations and quotation marks omitted in Antonelli).

Precedent in this Court and the Supreme Court has established that

> Intentional discrimination can be shown when: (1) a law or policy explicitly classifies citizens on the basis of race, see Hunt v. Cromartie, 526 U.S. 541 (1999); (2) a facially neutral law or policy is applied differently on the basis of race, see Yick Wo v. Hopkins, 118 U.S. 356 (1886); or (3) a facially neutral law or policy that is applied evenhandedly is motivated by discriminatory intent and has a racially discriminatory impact, see Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (1977).

Antonelli, 419 F.3d at 274. Similarly, in Equal Protection Clause cases, we apply strict scrutiny to actions with racially discriminatory purpose: (1) "all racial classifications imposed by government," Grutter, 539 U.S. at 327[30]; (2) policies or laws that are applied

---

[30] See also Seattle, 551 U.S. at 720 (K-12 education) ("It is well established that when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." (citing Johnson v. California, 543 U.S. 499, 505–06 (2005); Grutter, 539 U.S. at 326; Adarand, 515 U.S. at 224))); Gratz, 539 U.S. at 271 (university admissions) ("It is by now well established that '_all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized.'" (quoting Adarand, 515 U.S. at 224)); Johnson, 543 U.S. at 506 ("We have held that '[a]ll racial classifications [imposed by government] . . . must be analyzed by a reviewing court under strict scrutiny." (quoting Adarand, 515 U.S. at 227) (alteration in original)); Adarand, 515 U.S. at 228 (holding that "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing

33

differently on the basis of race, see Yick Wo, 118 U.S. 356; or (3) policies or laws for which ―a plaintiff establishes a discriminatory purpose based on race,‖ Pryor, 288 F.3d at 562.[31] However, ―absent a racially discriminatory purpose, explicit or inferable, on the part of the [decisionmaker], the statutory distinction is subject only to rational basis review.‖ United States v. Frazier, 981 F.2d 92, 95 (3d Cir. 1992) (citing Feeney, 442 U.S. 256; Davis, 426 U.S. 229).[32]

---

court under strict scrutiny‖); Pers. Adm‗r of Mass. v. Feeney, 442 U.S. 256, 272 (1979) (―A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification.‖ (citing Brown v. Board of Educ., 347 U.S. 483 (1954); McLaughlin v. Florida, 379 U.S. 184 (1964))); Bakke, 438 U.S. at 291 (university admissions) (―Racial and ethnic classifications . . . are subject to stringent examination without regard to [the discreteness and insularity of the persons being classified].‖).

[31] See also Arlington Heights, 429 U.S. at 265–66 (―when there is proof that a discriminatory purpose has been a motivating factor in the decision, . . . judicial deference is no longer justified‖).

[32] ―If state action does not burden a fundamental Constitutional right or target a suspect class, the ‗challenged classification must be upheld if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.‗‖ Doe v. Pennsylvania Bd. of Probation and Parole, 513 F.3d 95, 107 (3d Cir. 2008) (quoting Donatelli v. Mitchell, 2 F.3d 508, 513 (3d Cir. 1993)).

In its Memorandum on Conclusions of Law, the District Court referenced Justice Kennedy‗s concurrence in Seattle, in which Justice Kennedy notes that strict scrutiny is unlikely to apply to race conscious measures that do employ racial classifications. The District Court, however, did not determine whether that concurrence is binding under Marks v. United States, 430 U.S. 188 (1977), and Planned Parenthood v. Casey, 947 F.2d 682 (3d Cir. 1991). In their amicus brief, the NAACP Legal Defense & Educational Fund, Inc., the Lawyers Committee for Civil Rights Under Law, and the American Civil Liberties Union Foundation, amicus curiae, urge this Court to treat Justice Kennedy‗s concurrence in Seattle as binding.

1. Scrutiny Inquiry

    a.  Intentional Discrimination Shown by Racial Classification

The first alternative, a classification based explicitly on race, ―is presumptively invalid and can be upheld only upon an extraordinary justification." Crawford, 458 U.S.

---

In Marks, the Supreme Court held that, ―[W]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, ‗the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" 430 U.S. at 193 (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15); see also Casey, 947 F.2d at 693 (noting that Marks stands for the proposition that ―the controlling opinion in a splintered decision is that of the Justice or Justices who concur on the ―narrowest grounds"), overruled in part on other grounds by Planned Parenthood v. Casey, 505 U.S. 833 (1992).

In Seattle, the Chief Justice and four other Justices, including Justice Kennedy, agreed that racial classifications in the assignment plans at issue in that case required the application of strict scrutiny and that the plans did not survive strict scrutiny. Seattle, 551 U.S. at 720, 733–35. These portions of Chief Justice Roberts‗s opinion constitute the opinion of the Court and, thus, there is a ―single rationale explaining the result [that] enjoys the assent of five Justices." Neither Marks nor Casey governs the level of deference required by Justice Kennedy‗s concurring opinion in Seattle. Justice Kennedy‗s proposition that strict scrutiny is ―unlikely" to apply to race conscious measures that do not lead to treatment based on classification does not ―explain[ the result" of Seattle. The result of Seattle was the holding that the two assignment plans at issue employed race-based classifications and failed strict scrutiny, but Justice Kennedy‗s proposition pertains to assignment plans that do not require strict scrutiny because they do not employ race-based classifications. The portion of Justice Kennedy‗s concurrence discussing race-conscious measures is not binding because it is dicta; it refers to hypothetical facts and is not material to the result of Seattle.

As has occurred on other occasions with some other non-binding rationales, a future plurality or majority of the Court could adopt Justice Kennedy‗s rationale for race-conscious, non-discriminatory school assignments to give it precedential effect. See Grutter v. Bollinger, 539 U.S. 306, 325 (2003) (―today we endorse Justice Powell‗s view [from his Bakke concurrence] that student body diversity is a compelling state interest that can justify the use of race in university admissions"). Because the Supreme Court has not yet given its imprimatur to the propositions in Justice Kennedy‗s Seattle concurrence, it is not yet the law of the Supreme Court or binding on this Court.

35

at 536–37 (1982) (citing Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 272 (1979)); see also Adarand, 515 U.S. at 213. Thus, "when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny."[33] Seattle, 551 U.S. at 720 (citing Johnson v. California, 543 U.S. 499, 505–06 (2005); Grutter, 539 U.S. at 326; Adarand, 515 U.S. at 224). "The term racial classification 'normally refers to a governmental standard, preferentially favorable to one race or another, for the distribution of benefits.'" Anderson ex rel. Dowd v. City of Boston, 375 F.3d 71, 77 (1st Cir. 2004) (quoting Raso v. Lago, 135 F.3d 11, 16 (1st Cir. 1998), cert. denied, 525 U.S. 811, 1 (1998)). "A statute or policy utilizes a 'racial classification' when, on its face, it explicitly distinguishes between people on the basis of some protected category." Hayden v. Cnty. of Nassau, 180 F.3d 42, 48 (2d Cir. 1999).

Plan 3R is facially race neutral, assigning students to schools based only on the geographical areas in which they live. The Plan, on its face, neither uses racial classification as a factor in student assignment nor distributes any burdens or benefits on the basis of racial classification. The lack of racial classification in Plan 3R distinguishes Plan 3R from the policies in every Supreme Court equal protection education case upon

---

[33] The standard of review "is not dependent on the race of those burdened or benefited by a particular classification." Croson, 488 U.S. at 494 (citing Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 279–80 (plurality opinion); id. at 285–86 (O'Connor, J., concurring in part and concurring in the judgment)).

36

which Appellants rely in their brief[34] — in this manner, Plan 3R starkly differs from the

policies at issue in Seattle, Gratz, Grutter, Bakke, Brown, McLaurin v. Oklahoma State

Regents, 339 U.S. 637 (1950), and Sweatt v. Painter, 339 U.S. 629 (1950).[35]  In each of

---

[34] The District Court frequently distinguished Plan 3R from other equal protection cases because it does not make individual racial classifications.  For equal protection purposes, however, the key difference between Plan 3R and the policies at issue in other equal protection cases is not whether Plan 3R makes individual racial classifications as opposed to group or neighborhood racial classifications; it is whether Plan 3R makes racial classifications or does not.  Our holding addresses whether Plan 3R contains any racial classification or does not.  There is no precedent in this Court or the Supreme Court for holding that whether strict scrutiny is applied in equal protection challenges alleging racial discrimination in education admissions or assignments turns on whether a policy‗s racial classification is applied by group or by individual.

[35] Seattle, 551 U.S. at 711–12, 716 (the Supreme Court analyzed the policies of two different school districts, one in Seattle, Washington and the other in Jefferson County, Kentucky: Seattle School District No. 1‗s assignment policy considered race as one of the multiple tiebreaking factors to determine whether to assign a student to an ―oversubscribed‖ school; Jefferson County Public Schools‗ plan required certain schools to maintain black student enrollment between fifteen and fifty percent of the student population); Gratz, 539 U.S. at 253–57 (the policy made university admission decisions based on points given to applicants for multiple factors, including points awarded to applicants in underrepresented ethnic or racial groups, and the policy reserved ―protected seats‖ for applicants from ―protected categories,‖ including underrepresented minorities); Grutter, 539 U.S. 306 (the policy admitted students based on an evaluation of all the information in each student‗s file, which included an essay on how the applicant would contribute to the school‗s diversity; reaffirmed the school‗s commitment to diversity with special reference to the inclusion of certain racial and ethnic groups; and stated that the school wanted to enroll a ―critical mass‖ of underrepresented minority students); Bakke, 438 U.S. 265 (policy included a special admissions program that considered applicants who self-identified as minority group members and admitted a prescribed number of self-identified minority students each year); Brown, 347 U.S. 483 (policies permitted separate schools for black children and white children); McLaurin, 339 U.S. at 638 (policy denied admission on the basis of race because state statute criminalized operating, teaching, or attending an integrated school); and Sweatt v. Painter, 339 U.S. 629 (policy restricted

those cases, the school district or university policy at issue used racial classifications as the sole factor, or as one factor among many, to make determinations regarding student school assignments or admission to a higher education institution.

In Bakke, the Court even noted that the policy ―involves a purposeful, acknowledged use of racial criteria. This is not a situation in which the classification on its face is racially neutral, but has a disproportionate racial impact. In that situation, plaintiff must establish an intent to discriminate.‖ Bakke, 438 U.S. at 289 n.27 (citing Arlington Heights, 429 U.S. 252; Davis, 426 U.S. 229).

The facial neutrality of Plan 3R also distinguishes it from the policies in many of the Supreme Court race-based equal protection cases upon which Appellants rely in their brief ― Adarand, Croson, and Plessy.[36] Moreover, in Adarand, the Court emphasized that the ―case concerns only classifications based explicitly on race, and presents none of the additional difficulties posed by laws that, although facially race neutral, result in

enrollment to white students, in accordance with state law, and rejected an application solely because of the applicant‗s race).

[36] Adarand, 515 U.S. at 213 (policy employed a race-based rebuttable presumption in some certification decisions); Croson, 488 U.S. at 477 (policy required certain contractors to whom the city awarded construction contracts to subcontract at least thirty percent of the dollar amount of the contract to a minority business); Plessy, 163 U.S. at 540 (statute required that railway companies provide separate accommodations for passengers based on race); see also Ricci v. DeStefano, -- U.S. ----, 129 S. Ct. 2658, 2664–65 (2009) (relied upon by Appellants, but Ricci is inapposite because the Supreme Court did ―not reach the question whether respondents‗ actions may have violated the Equal Protection Clause‖). Shaw v. Hunt, 517 U.S. 899 (1996), and Arlington Heights are the only cases upon which Appellants rely in their brief that involve facially race neutral policies or laws.

racially disproportionate impact and are motivated by a racially discriminatory purpose."
515 U.S. at 213.

Appellants repeatedly frame the central question in this case as whether ―race was a factor," or whether race was considered. (Appellant's Br. at 28, 30, 34, 35, 36, 38.) Although Appellants argue that, if race is a factor in a decision, we must apply strict scrutiny, counsel for Appellants admitted at oral argument that being aware of or considering race when making some decisions can be proper within certain circumstances, including doing so to achieve a better racial composition within a school. In any event, these arguments are irrelevant to our inquiry. Appellants and the District Court conflate the consideration or awareness of race with (1) racial classifications and (2) racially discriminatory purpose. Equal protection law does not make the same conflation. As a result, both the District Court and Appellants improvidently believed that the appropriate level of scrutiny to apply was strict scrutiny.

The District Court conflated discriminatory purpose with the consideration or awareness of race and in doing so stated an incorrect standard for determining the appropriate level of scrutiny. The District Court cited the <u>Pryor</u> holding that an action adopted because of ―a discriminatory purpose based on race" requires strict scrutiny analysis. <u>Pryor</u>, 288 F.3d at 562 (emphasis added). In restating that holding, however, the District Court substituted ―race" for ―discriminatory purpose," and incorrectly characterized <u>Pryor</u> to hold that, ―once <u>race</u> has been shown to be a motivating factor in

39

decisionmaking, all racial classifications must survive strict scrutiny." (App. at A76 (emphasis added)).

A racial classification occurs only when an action "distributes burdens or benefits on the basis of" race. Seattle, 551 U.S. at 720. In United States v. Hays, 515 U.S. 737 (1995), the Court noted that the record contained "evidence tending to show that the legislature was aware of the racial composition of [the districts in which the plaintiffs lived]," but the Court also noted that "the legislature always is aware of race when it draws district lines." Id. at 744 (emphases added) (quoting Shaw v. Reno, 509 U.S. 630, 646 (1993) (Shaw I)) (internal quotation marks omitted). "That sort of race consciousness does not lead inevitably to impermissible race discrimination" and proof of that race consciousness "in the redistricting process is inadequate to establish injury in fact." Id. at 745–46. Moreover, the Court noted that the justices had "never held that the racial composition of a particular voting district, without more, can violate the Constitution." Id. at 746.

Similarly, the District Court misstated the legal standard for determining the appropriate level of scrutiny as described in Arlington Heights because the District Court conflated race as a factor with discriminatory purpose. In Arlington Heights, the Supreme Court noted that, "[w]hen there is a proof that a discriminatory purpose has been a motivating factor in the decision, . . . judicial deference is no longer justified." 429 U.S. at 265–66 (emphasis added). The District Court incorrectly stated that

40

Arlington Heights held that such deference is no longer justified when ―race was a motivating factor." (App. at A78 (emphasis added).) Neither Pryor nor Arlington Heights stands for the proposition that strict scrutiny must be applied when race, but not a discriminatory purpose, was a motivating factor.

Racially discriminatory purpose means that the decisionmaker adopted the challenged action at least partially because the action would benefit or burden an identifiable group. Feeney, 442 U.S. at 279 (―discriminatory purpose" "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part ‗because of,‘ not merely ‗in spite of,‘" the action‘s beneficial or adverse effects ―upon an identifiable group"). Thus, the mere awareness or consideration of race should not be mistaken for racially discriminatory intent or for proof of an equal protection violation. Pryor, 288 F.3d at 562 (―A mere awareness of the consequences of an otherwise neutral policy will not suffice." (citing Feeney, 442 U.S. at 277–78)).[37]

Appellants also conflate a school assignment policy that explicitly classifies based on race with the consideration or awareness of neighborhood racial demographics during

_____

[37] It is also error to treat ―‗racial motive‘ as a synonym for a constitutional violation" or ―racial classification." Raso, 135 F.3d at 16 (holding that an action that is adopted because of a ―racial motive" or purpose is not ―automatically ‗suspect‘ under the Equal Protection Clause"). This holds true even for a decisionmaker‘s racially discriminatory purpose. Racially discriminatory purpose, alone, is not a racial classification because racial classification is more than a mere thought. Compare Seattle, 551 U.S. at 720 (racial classification occurs when an action ―distributes burdens or benefits on the basis of" race), with discussion of racially discriminatory purpose, infra Part III.A.i.3.b, noting that racially discriminatory purpose refers to the purpose or intent in selecting an action and not to whether the selected action resulted in actual discrimination or classifications.

41

the development and selection of a policy. The former is a facially racial policy, such as the policies in Seattle, Gratz, Grutter, Bakke, Brown, McLaurin, and Sweatt. The consideration or awareness of race while developing or selecting a policy, however, is not in and of itself a racial classification. Thus, a decisionmaker's awareness or consideration of race is not racial classification. Designing a policy ―with racial factors in mind‖ does not constitute a racial classification if the policy is facially neutral and is administered in a race-neutral fashion. Hayden, 180 F.3d at 48 (holding that designing a policy with a racially discriminatory purpose should not be construed as a facial classification when the policy does not explicitly, or in its application, distinguish between people on the basis of a protected category).

When the Supreme Court, in Seattle, Grutter, and Bakke, has referenced applying strict scrutiny to a ―plan that uses race as one of many factors,‖ it has meant just that ― strict scrutiny should be applied to a school admissions or student assignment policy or plan that uses race as a factor to determine whether a student is admitted or assigned to a school. Grutter, 539 U.S. at 339; see also Seattle, 551 U.S. at 793; Bakke, 438 U.S. at 318-19 (Opinion of Powell, J.). The Court has never held that strict scrutiny should be applied to a school plan in which race is not a factor merely because the decisionmakers were aware of or considered race when adopting the policy. When there is no racial classification in the plan, strict scrutiny is only applied if plaintiffs show discriminatory intent.

The first alternative by which intentional discrimination can be shown — racial classification — is inapposite to Plan 3R and the facts of this case. Strict scrutiny analysis is not appropriate on this basis.

> b. Intentional Discrimination Shown by Discriminatory
> Application of a Facially Neutral Policy

The second alternative to show intentional discrimination — that a facially neutral policy is applied differently on the basis of race — is also inapplicable to Plan 3R. There is no record evidence that the District has applied Plan 3R in a discriminatory manner. The Supreme Court first established the standard for this method of proving an Equal Protection violation in Yick Wo. In that case, the city and county of San Francisco denied every Chinese laundry owner a permit to operate a laundry business, but denied permits for only one of approximately eighty non-Chinese laundry owners. With that example of discriminatory application of a law in mind, to demonstrate that Plan 3R is applied differently on a discriminatory basis, Appellants would have needed to show below that the District enforces Plan 3R within some areas or regarding some students, on the basis of race, while not enforcing Plan 3R within other areas or regarding other students. Appellants have not alleged that Plan 3R is enforced in a disproportionate manner.

> c. Intentional Discrimination Shown by Discriminatory
> Purpose for a Facially Neutral Policy

To establish government action within the third alternative, a plaintiff is ―required to prove that the actions of . . . officials (1) had a discriminatory effect and (2) were motivated by a discriminatory purpose.‖[38] Bradley v. United States, 299 F.3d 197, 205 (3d Cir. 2002) (citing Arlington Heights, 429 U.S. at 264–66 (race discrimination); Davis, 426 U.S. at 239–42 (race discrimination); Chavez v. Ill. State Police, 251 F.3d 612, 635–36 (7th Cir. 2001) (race discrimination)).

i.  Discriminatory Impact

Although disproportionate impact, alone, is not dispositive, a plaintiff must show discriminatory impact in order to prove an equal protection violation under this third alternative. ―[N]o case in [the Supreme] Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it.‖ Palmer v. Thompson, 403 U.S. 217, 224 (1971). In Palmer, the Supreme Court noted that ―there is an element of futility in a judicial attempt to invalidate a law [solely] because of the bad motives of its supporters. If the law is struck down for this reason, rather than

---

[38] See also Antonelli, 419 F.3d at 274 (holding that, to show an equal protection violation when the policy is facially neutral, ―the Appellants would have to show that the Appellees acted with discriminatory intent and the [policy] had a discriminatory impact‖); cf. Adarand, 515 U.S. at 213 (noting that ―this case concerns only classifications based explicitly on race, and presents none of the additional difficulties posed by laws that, although facially race neutral, result in racially disproportionate impact and are motivated by a racially discriminatory purpose‖) (citing Arlington Heights, 429 U.S. 252; Davis, 426 U.S. 229); Bakke, 438 U.S. at 289 n.27 (noting that the policy at issue ―involves a purposeful, acknowledged use of racial criteria. This is not a situation in which the classification on its face is racially neutral, but has a disproportionate racial impact. In that situation, plaintiff must establish an intent to discriminate.‖) (citing Arlington Heights, 429 U.S. 252; Davis, 426 U.S. 229).

because of its facial content or effect, it would presumably be valid as soon as the legislature or relevant governing body repassed it for different reasons." Id. at 225. Moreover, discriminatory impact must be shown to establish an equal protection violation because ―plaitiffs must show that they have been injured as a result" of the governmental action to ensure that courts ―ean impose a meaningful remedy." Garza v. County of Los Angeles, 918 F.2d 763, 771 (9th Cir. 1990).

To establish discriminatory impact in a racial discrimination case, Appellants must show that similarly situated individuals of a different race were treated differently. The Appellants do not meet this burden.

Despite Appellants' numerous references to the alleged consideration of race by Board members and Administrators during discussions of Scenarios and Proposed Plans, Appellants have not provided any evidence that Plan 3R treats similarly situated individuals of a different race in a different manner. Along with Students Doe, all white students in the Affected Area are also assigned to attend Harriton without the choice to attend LMHS unless they live within the LMHS walk zone. Appellants have not provided any evidence that Plan 3R treats black individuals outside of the Affected Area in the same way in which it treats Students Doe or other black individuals who live in the Affected Area. North Ardmore, like the Affected Area, has a high percentage of African-American residents in comparison to other areas. However, all of the students in North Ardmore, both black and white, are assigned to attend LMHS, not Harriton, where

45

Students Doe and Affected Area students are assigned. Two-thirds of the students redistricted to Harriton were students who were not African-Americans and who lived in the Affected Area or other areas redistricted to Harriton under plan 3R.[39] Plan 3R does not treat black students in the Affected Area and North Ardmore similarly, nor does it treat white students in either area similarly to other white students or differently from the black students in the same area.[40] No evidence has been provided indicating assignments based on racial classification here.

To show a discriminatory impact in the form of a stigma, Appellants would still need to demonstrate that they —are personally denied equal treatment by the challenged discriminatory conduct."[41] Allen, 468 U.S. at 756 (quoting Heckler v. Mathews, 465

---

[39] See discussion supra Part I.C, noting that, in 2009–2010 under Plan 3R, twenty-one students from the Affected Area were redistricted to Harriton, fourteen of whom were African-American. Twenty-three students from areas districted for Penn Valley Elementary School were also redistricted to Harriton, none of whom were African-American. Less than one-third of the students redistricted were African-Americans from the Affected Area.

[40] Cf., Brown v. Philip Morris, Inc., 250 F.3d 789, 797–98 (3d Cir. 2001) (discussing civil rights claims under 42 U.S.C. §§ 1981, 1982). In Brown, we held that Plaintiff African-American smokers —at no place in their submissions . . . argue any disparities . . . on the basis of race" where Plaintiffs conceded that Philip Morris —sold] menthol cigarettes to African-Americans at the same price and on the same terms as such products are offered to whites" and Plaintiffs —do not allege that the mentholated tobacco products sold to African-Americans differ from those sold to whites." Id.

[41] See also Allen, 468 U.S. at 756 (holding that plaintiffs had no standing to challenge allegedly racially discriminatory tax exemptions to racially discriminatory schools because plaintiffs did not allege that their children had ever applied or would ever apply to the discriminatory schools); O'Shea v. Littleton, 414 U.S. 488 (1974) (holding that

U.S. 738, 739–40 (1984)) (internal quotation marks omitted). Furthermore, the Court's

discussion of stigma has been in the context of racial classifications. See generally,

Johnson v. California, 543 U.S. 499, 507 (2005) ("[a]s we have recognized in the past,

racial classifications threaten to stigmatize individuals by reason of their membership in a

racial group" (quoting Shaw v. Reno, 509 U.S. at 643) (internal quotation marks

omitted)). Because Plan 3R includes no racial classifications, arguments regarding

stigma are of no avail.

Appellants can also show discriminatory impact by demonstrating that there are

racial classifications in the school assignment system. Such classifications force students

"to compete in a race-based system that may prejudice" them. Seattle, 551 U.S. at 718–

19 (internal quotation marks omitted). In such circumstances, the discriminatory impact

"is the denial of equal treatment resulting from the imposition of the barrier. . . . And in

the context of a challenge to a set-aside program, the 'injury in fact' is the inability to

compete on an equal footing in the bidding process." Gratz, 539 U.S. at 262 (quoting Ne.

Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville, 508 U.S. 656, 666

(1993)). Unlike the systems at issue in Seattle, Plan 3R is not a race-based system and,

under Plan 3R, there is no possibility that any of the Students Doe will be denied a school

plaintiffs had no standing to challenge racial discrimination in a city's criminal justice
system because plaintiffs had not alleged that they had been or would likely be subject to
the challenged practices); Moose Lodge No. 107 v. Irvis, 407 U.S. 163 (1972) (holding
that a plaintiff had no standing to challenge a club's racially discriminatory membership
policies because plaintiff had not applied for membership).

assignment because of his or her race.  Appellants cannot rely on <u>Seattle</u>, <u>Grutter</u>, <u>Gratz</u>, or <u>Bakke</u> to demonstrate discriminatory impact because Plan 3R imposes no racial barrier and assigns students on an equal basis — geography.

### ii.  Discriminatory Purpose

Even if we were to conclude that Appellants have shown discriminatory impact, "the Fourteenth Amendment guarantees equal laws, not equal results."  <u>Feeney</u>, 442 U.S. at 273.  The Supreme Court held in <u>Washington v. Davis</u>, 426 U.S. 229 (1976), that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."  <u>Arlington Heights</u>, 429 U.S. at 266.  "When there is a proof that a discriminatory purpose has been a motivating factor in the decision, . . . judicial deference is no longer justified" and courts should apply strict scrutiny.[42]  <u>Id.</u> at 266–67.  However, "absent a racially discriminatory purpose, explicit or inferable, on the part of the [decisionmaker], the statutory distinction is subject only to rational basis review."  <u>Frazier</u>, 981 F.2d at 95 (citing <u>Feeney</u>, 442 U.S. 256; <u>Davis</u>, 426 U.S. 229).

The term "discriminatory purpose" "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,'" the action's beneficial or adverse effects "upon an identifiable group."[43]  <u>Feeney</u>, 442

---

[42] The racially discriminatory purpose need not be the sole or primary factor motivating the decision to adopt the challenged action.  <u>Arlington Heights</u>, 429 U.S. at 266.

[43] <u>See also</u> <u>Antonelli</u>, 419 F.3d at 274 ("the government's 'benign' use of racial considerations in decision-making . . . is no less subject to strict scrutiny than 'invidious'

U.S. at 279. Racially discriminatory purpose means that the decisionmaker adopted the challenged action at least partially because the action would benefit or burden an identifiable group. ―Even conscious awareness on the part of the [decisionmaker] that the [policy] will have a racially disparate impact does not invalidate an otherwise valid law, so long as that awareness played no causal role‖ in the adoption of the policy. Frazier, 981 F.2d at 95 (citing Feeney, 442 U.S. at 279).

In Arlington Heights, the Supreme Court outlined how courts should determine whether a discriminatory purpose was a motivating factor. The determination requires a ―sensitive inquiry‖ into the available ―circumstantial and direct evidence of intent,‖ including: (1) whether the official action has a racially disproportionate impact; (2) the historical background of the decision; and (3) the legislative or administrative history of the decision. Arlington Heights, 429 U.S. at 266–68. Proof put forth to demonstrate discriminatory intent ―must necessarily usually rely on objective factors.‖ Feeney, 442 U.S. at 278 n.24.

If discriminatory impact cannot be ―plausibly explained on a neutral ground, impact itself would signal that the real classification made by the law was in fact not neutral.‖ Id. at 275. However, ―just as there are cases in which impact alone can unmask an invidious classification, there are others, in which — notwithstanding impact — the legitimate noninvidious purposes of a law cannot be missed.‖ Id. As stated above,

use of racial considerations in decision-making‖) (citing Croson, 488 U.S. at 493–94; Adarand, 515 U.S. at 226–27).

49

Plan 3R does not have a discriminatory impact. Even if we were to find that Plan 3R has a discriminatory impact, the District has plausibly explained any such impact on a neutral ground. The Board's goals in redistricting included the Non-Negotiables of equalizing the enrollments of Harriton and LMHS and not increasing the number of buses required. The Community Values during redistricting included allowing students who walked to school to continue walking to school, minimizing travel-time for bused students, and to ensure that children were in comfortable learning environments.

In addition to these neutral bases for the selection of Plan 3R, the District Court noted other race-neutral explanations for the adoption of Plan 3R, including helping students attain educational excellence, developing a 3-1-1 Feeder Pattern, and closing the achievement gap between students. Moreover, there is no evidence establishing that the District Court clearly erred when it found credible the Board members' testimony that race was not the basis of their votes for Plan 3R.

In <u>Feeney</u>, the Supreme Court held that the neutral purposes of a statute, aimed to benefit veterans ―prœide[d] the surest explanation for its impact" benefitting more men than women. <u>Id.</u> The Court continued, stating that the law could not rationally be explained as a pretext for preferring men over women because significant numbers of those placed at a disadvantage by the law were men. Comparably, Plan 3R redistricts to Harriton a significant number of students who are not African-American. Even while grandfathering was still in effect, forty-four students were redistricted to Harriton for the

2009–2010 school year and thirty of those students, nearly two-thirds, are not African-American.

When inquiring into the historical background of the decision to redistrict and adopt Plan 3R, there is nothing that sparks suspicion of discriminatory intent and Appellants have not alleged otherwise. The decision to redistrict was born of a capital improvement program intended to modernize every school in the district. Under the plan in effect prior to Plan 3R, the enrollment of the District's two high schools was very uneven (LMHS had roughly twice the number of students that Harriton had) and the District was committed to equalizing the two high schools. The process to select a new student assignment plan was carried out over a number of months with the involvement of the public.

To ascertain whether there was discriminatory intent in the development and selection of Plan 3R, Appellants and the District Court appear focused on the administrative history, especially on statements made by Board members and the information included in reports and presentations. Appellants pay particular attention to when racial demographics only or racial demographics in addition to other socioeconomic demographics were or were not included in report estimates, slide presentations, personal notes, and on the District's website. Awareness of such data or omitting such data, however, does not constitute discriminatory intent. ―[C]onscious awareness" of a racially disparate impact of a facially neutral policy is irrelevant to equal

51

protection analysis. See Frazier, 981 F.2d at 95 (citing Feeney, 442 U.S. at 279). Additionally, the mere awareness of data regarding racial demographics under various Scenarios and Proposed Plans is not necessarily awareness of racially disparate impact. The racial data showed, under some Scenarios and Proposed Plans, that there would not be a racially disparate impact. For a facially neutral policy, awareness of a racially discriminatory impact is only relevant if the policy is adopted at least in part because of a racially discriminatory impact. Id.

While the statements upon which Appellants rely may indicate awareness or consciousness of race, the statements do not constitute discriminatory intent, i.e., that Plan 3R was developed or selected because it would assign benefits or burdens on the basis of race. Instead of being adopted for the purpose of discrimination, the statements indicate, if anything, that Board members and Administrators adopted Plan 3R in an attempt not to discriminate on the basis of race. Testimony that Scenario 1 was eliminated ―due to inequitable racial balancing" could indicate that the Administration did not want to propose a plan that seemed to treat students differently on the basis of race, by having a disproportionate percentage of students of a certain race redistricted. (App. at A24.) Notably, the Administration decided not to formulate any proposed plans based on Scenarios 1, 2, or 5. Scenarios 1 and 2 would redistrict both areas with higher African-American populations, the Affected Area and North Ardmore, to attend Harriton and Scenario 5 would keep students in both of those areas assigned to LMHS. Thus, the

52

only Scenarios selected to develop into proposed plans were those that did not treat the two areas with the highest African-American populations in the same manner. Because all of the Scenarios assigned students geographically, no Scenario or Proposed Plan treated similarly situated African-American students differently from other students. Moreover, the District eliminated the Scenarios that arguably treated differently situated African-American students similarly, by assigning both areas with higher African-American populations to the same school.

Given these circumstances, it is nearly inconceivable that the District intended to discriminate on the basis of race. DiBonaventuro's September 2008 email reaffirms the anti-discriminatory goals of the redistricting process. In her email, she stated that the Board should emphasize that it is not trying to increase Harriton's diversity, but that it, instead, is trying to ensure numerically equal total student enrollments at both high schools.

Board and Administrator references to ―diversity‖ do not imply a discriminatory purpose. On the contrary, references to diversity in the context of this facially neutral policy implied that decisionmakers did not want the selected plan to have a racially disproportionate impact. Avoiding discriminatory impact seemed to be one of the District's goals in developing and adopting a plan. Because the African-American students were ―more concentrated‖ geographically, assigning students based on

geography could easily lend itself to disproportionate impact unless the Board members were aware of the demographics of the areas during the redistricting process.

In Arlington Heights and Feeney, the Supreme Court found that, despite awareness of disparate impact on a group, there was no showing of discriminatory intent in the formulation or adoption of the actions at issue. The Court in Arlington Heights held that a zoning decision that bore more heavily on racial minorities was nonetheless not adopted due to discriminatory intent because the majority of the statements by the decisionmakers focused on neutral factors and the zoning policy had been applied consistently. 429 U.S. at 270.

Similarly, Plan 3R has been applied consistently, regardless of race, and the majority of Board members' discussions regarding Lower Merion redistricting focused on neutral factors: (a) equalizing the populations at the two high schools, (b) minimizing travel time and transportation costs, (c) fostering educational continuity, and (d) fostering walkability. Additionally, Plan 3R did not bear more heavily on racial minorities.[44]

In Feeney, the Court held that there was no discriminatory purpose in the adoption of a statute that benefited an overwhelmingly male class — veterans — because the benefit was consistently offered to any person who was a veteran, including women. Similarly, Plan 3R consistently assigns students, including students who are not African-American, based on the location of their residence.

---

[44] Less than one-third of the students redistricted were African-Americans from the Affected Area.

In <u>Pryor</u>, the Court held that the plaintiffs had sufficiently alleged discriminatory intent because the complaint and exhibits alleged that the NCAA stated that it adopted a policy because ―it believed the adoption of this policy would increase the graduation rates of black athletes relative to white athletes." 288 F.3d at 564. The Court noted that the complaint did not merely allege that the NCAA was aware of the likely racially disproportionate impact; plaintiffs alleged that this discriminatory impact was the NCAA's ―purpose," "stated goal," and ―pretext" for adopting the policy. <u>Id.</u> at 564–65. In contrast, Appellants have not demonstrated that the District formulated or adopted Plan 3R at least partially to benefit or burden African-American students.

Significantly, the District Court found credible the Board members' testimony that race was not the basis of their votes for Plan 3R. We see no evidence of clear error in that finding. If race was not the basis of the Board members' votes for Plan 3R, it follows logically that they did not vote to adopt Plan 3R for racially discriminatory reasons.

Thus, none of the three alternatives necessary to show intentional discrimination and to trigger strict scrutiny is applicable to Plan 3R.

### 2. Racially Discriminatory Intent in Electoral Redistricting

The District Court held that strict scrutiny was appropriate because it opined that the Affected Area was "targeted" for redistricting to Harriton, in part, because it has a high concentration of African-American students. Similarly, our colleague, in her

55

concurrence, concludes that we are required to apply strict scrutiny because, as she notes, the racial composition of neighborhoods was considered in determining school assignments. The concurrence suggests a paradigm not present or contemplated in our law – be aware of or talk about race and strict scrutiny is triggered. This theory is untenable. There is no precedent in this Court or the Supreme Court holding that we apply strict scrutiny in equal protection challenges alleging racial discrimination in education admissions or assignments because decisionmakers were cognizant of the racial demographics of neighborhoods when they selected the assignment plan.

At oral argument, counsel for Appellants compared Plan 3R to electoral redistricting, an area for which the Supreme Court has set out tests for determining whether strict scrutiny should be applied to redistricting that involves the consideration of racial demographics. It is not clear that the electoral redistricting precedent controls in the educational context, but, even if we were to apply that precedent to the facts in Doe, we would still hold that Plan 3R was not developed or adopted for a discriminatory purpose and, thus, should not be subjected to strict scrutiny.

In equal protection challenges to electoral redistricting, the Supreme Court has held that strict scrutiny does not apply to facially race neutral legislation merely because (a) ―redistricting is performed with consciousness of race" or (b) because there was an ―intentional creation of majority-minority districts." Bush v. Vera, 517 U.S. 952, 958 (1996). The Court has held, instead, that, for strict scrutiny to apply to facially race

56

neutral electoral redistricting legislation, the plaintiff must prove that (1) the statutes, "although race neutral, are, on their face, 'unexplainable on grounds other than race,'" Shaw I, 509 U.S. at 643 (quoting Arlington, 429 U.S. at 266) or that (2) "legitimate districting principles were 'subordinated' to race" such that "race must be 'the predominant factor motivating the legislature's [redistricting] decision,'" Vera, 517 U.S. at 958–59, or the statute.

Because Plan 3R is facially race neutral, "consciousness of race," alone, will not require the application of strict scrutiny. Cf. Vera, 517 U.S at 958 (noting that strict scrutiny does not apply "merely because [electoral] redistricting is performed with consciousness of race"). Although the Affected Area has the highest concentration of African-American students in Lower Merion, that fact does not require strict scrutiny. Cf. id. at 958 (noting that strict scrutiny does not "apply to all cases of intentional creation of majority-minority [electoral] districts").

For strict scrutiny to apply to Plan 3R, the plan would have to be "unexplainable on grounds other than race" or it must be shown that other legitimate redistricting principles were subordinated to race such that race was the predominant factor motivating the District's redistricting decision. Shaw I, 509 U.S. at 643. Appellants have not cast doubt on the proposition that equalizing the student enrollments at the two high schools was the primary factor motivating redistricting and the adoption of Plan 3R. The other primary factors motivating the decision included: minimizing travel time and

transportation costs, increasing educational continuity such that students who attended the same elementary school would stay together through middle school and high school, and fostering walkability.

As the District Court noted, the decision to adopt Plan 3R is explainable on grounds other than race. Moreover, race was not the predominant factor motivating the decision to adopt Plan 3R. If race had been the predominant factor, the District likely would have adopted a plan that: assigned students based on race; moved white students or predominantly white neighborhoods to LMHS, while moving African-American students or high concentration African-American areas to Harriton without increasing the student population at Harriton or decreasing the student population at LMHS; or draw new district lines that were not quadrilateral, following major streets and natural boundaries. Additionally, race does not explain why the District would adopt Plan 3R instead of adopting Plan 1, which would have resulted in African-American students being 9.9% of the Harriton student population, or Plan 3, which would have resulted in African-American students being the same percentage of the Harriton student population as in Plan 3R. Thus, strict scrutiny would not be applied to Plan 3R under the Supreme Court's electoral redistricting precedent.

Regarding Plan 3R, there has not been ―proof that a discriminatory purpose has been a motivating factor in the decision.‖ Arlington Heights, 429 U.S. at 265–66. Because Plan 3R is ―absent a racially discriminatory purpose, explicit or inferable, on the

58

part of the [decisionmakers], [it] is subject only to rational basis review." Frazier, 981 F.2d at 95 (citing Feeney, 442 U.S. 256; Davis, 426 U.S. 229).[45]

ii. Constitutional Analysis

Under rational basis review, the challenged classification must be upheld if it is "rationally related to a legitimate state interest." City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976) (per curiam). Plan 3R is rationally related to a legitimate interest "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Donatelli v. Mitchell, 2 F.3d 508, 513 (3d Cir. 1993) (quoting FCC v. Beach Commc'n, Inc., 508 U.S. 307, 313 (1993)) (internal quotation marks omitted).

In determining whether Plan 3R is reasonably related to legitimate state interests, our review is highly deferential. "[J]udges are not well suited to act as school administrators. Indeed, in the context of school desegregation, this Court has repeatedly stressed the importance of acknowledging that local school boards better understand their own communities and have a better knowledge of what in practice will best meet the educational needs of their pupils." Seattle, 551 U.S. at 848–49 (citing Milliken v. Bradley, 418 U.S. 717, 741–42 (1974)).

---

[45] See also Doe v. Pennsylvania Bd. of Probation and Parole, 513 F.3d 95, 107 (3d Cir. 2008) ("If state action does not burden a fundamental Constitutional right or target a suspect class, the 'challenged classification must be upheld if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" (quoting Donatelli v. Mitchell, 2 F.3d 508, 513 (3d Cir. 1993))).

Applying this deferential standard of review, we conclude that Plan 3R is rationally related to legitimate government interests. As noted by the District Court, the District presented evidence that Plan 3R is aimed at addressing the following goals: (a) equalizing the populations at the two high schools, (b) minimizing travel time and transportation costs, (c) fostering educational continuity, and (d) fostering walkability. Plan 3R is reasonably related to these four goals. Equalizing the populations at Harriton and LMHS was the impetus for redistricting. The CAC supported this capital improvement proposal because committee members thought that, with equalized high school populations, students would benefit from a stronger sense of community, better interactions with faculty, and better educational outcomes. Equalizing student enrollment between the two schools required redistricting because, under the prior plan, LMHS had 700 more students than Harriton. Under Plan 3R, student enrollment at the two high schools is projected, under some estimates, to equalize to a difference of only a handful of students.

The creation of a 3-1-1 Feeder Pattern under Plan 3R is rationally related to the Board's legitimate goal of ensuring educational continuity. Administrators and Board members testified that aiming to keep students in the same schools as their classmates from kindergarten through high school has pedagogical and psychological benefits. Plan 3R's goal of fostering walkability by restoring the historic LMHS walk zone, which is larger than the limited walk zone proposed prior to Plan 3R's adoption, is rationally

related to a legitimate state interest because it saves the District money that would otherwise be needed to cover the cost of buses. The District has a legitimate interest in not increasing its number of buses because doing so would increase costs. Plan 3R is rationally related to this goal because Plan 3R does not increase the number of buses required and it also takes into account minimizing travel times. Additionally, the Affected Area is one of the areas closer to Harriton in travel time. Accordingly, the District Court's selection of Plan 3R has a rational basis and does not violate the Equal Protection Clause.

## B. Title VI and 42 U.S.C. § 1981

Title VI and 42 U.S.C. § 1981 prohibitions against discrimination are coextensive with those of the Equal Protection Clause. See Grutter, 539 U.S. at 343; Bakke, 438 U.S. at 287 (opinion of Powell, J.) (―Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause"); Gen. Bldg. Contractors Ass'n., Inc. v. Pennsylvania, 458 U.S. 375, 389–91 (1982) (―§ 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination"). As stated above, Plan 3R does not violate the Equal Protection Clause. Therefore, Appellants' remaining claims, pursuant to Title VI and 42 U.S.C. § 1981, must also fail. See Grutter, 539 U.S. at 343 (holding that, because ―the Equal Protection Clause does not prohibit the Law School's narrowly tailored use of race in admissions decisions[,] . . . petitioner's statutory claims based on Title VI and 42 U.S.C. § 1981 also fail").

## C. Testimony of Drs. Lyles and Jarvis

On appeal, Appellants continue to argue that the testimony of Drs. Lyles and Jarvis should have been precluded; however, Appellants make no new arguments regarding this testimony.

Federal Rule of Civil Procedure 26(a)(1) requires a party, at initial disclosure, to provide information for ―each individual likely to have discoverable information ― along with the subjects of that information ― that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.‖ FED. R. CIV. P. 26(a)(1). Drs. Lyles and Jarvis did not participate in the redistricting process and, thus, they did not have discoverable knowledge regarding the litigation. Instead, the District questioned Drs. Lyles and Jarvis regarding Dr. McGinley and his work on the achievement gap. The District sought to admit this testimony because the doctors had worked with Dr. McGinley and had personal knowledge about ―his work concerning issues such as the achievement gap, his advocacy for children of color and children with disabilities, and his commitment to ensuring greater access to challenging coursework for minority students and students with disabilities.‖ (Appellee‗s Br. at 64.)

The District asserts that it learned about Drs. Lyles and Jarvis on March 11, 2010, one day before the deadline for its Pretrial Memorandum. The District, then, listed the two new witnesses in its Pretrial Memorandum. As the District noted in its reply brief to the Appellants‗ Motion in Limine, District Courts have ―allowed parties to call witnesses

62

in rebuttal even when they were not disclosed in a pretrial memorandum or order, as long as the witness and his testimony are within the scope of proper rebuttal." (App. at A302 (citing Upshur v. Shepherd, 538 F. Supp. 1176, 1180 (E.D. Pa. 1982)).) The District argued that the testimony sought from these witnesses was within the proper scope of a rebuttal to the Appellants' allegation that the District violated federal law.

Appellants have not claimed that the District Court abused its discretion in denying the motion to preclude testimony, nor does it appear that they could support such a claim. Neither precedent nor any Federal Rule of Civil Procedure requires the testimony's preclusion. The District Court did not abuse its discretion in denying the motion and we will affirm the denial of Appellants' motion.

## IV. CONCLUSION

For the reasons set forth above, we will affirm the judgment of the District Court.

**STUDENT DOE v. LOWER MERION SCHOOL**

**No. 10-3824**

---

**ROTH**, <u>Circuit Judge</u>, <u>Concurring</u>:

I concur with the result reached by the majority. I would, however, arrive there by a more arduous route. For reasons that I will explain below, I believe that strict scrutiny is the test to be applied here. In addition, I conclude that the assignment plan here meets the strict scrutiny test.

First, I agree with the holding of the District Court:

> Applying strict scrutiny to [the facts of this case], the Court concludes that the District has satisfied its burden of showing that Plan 3R was narrowly tailored to meet numerous race-neutral compelling interests – namely, having two equally sized high schools, minimizing travel time and costs, maintaining educational continuity, and fostering students' ability to walk to school. The District's mere consideration of the racial demographics of Plaintiffs' neighborhood does not warrant an opposite conclusion under existing Supreme Court or Third Circuit precedent.

Because Plan 3R is narrowly tailored to meet the school district's compelling interests, it survives strict scrutiny. In my view, however, there is a problem with my conclusion. I am not happy that the test for reviewing a plan

1

to create diversity in a student body should be strict scrutiny. I believe that diversity is a worthy goal for student assignments in a school district. My concern is that Supreme Court precedent, and in particular the decision in *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007), does not permit a school district to institute a plan to diversify student populations of a school district on the basis of race.

In Part III.B of *Seattle*, Chief Justice Roberts, in his plurality opinion, concluded that school attendance plans "directed only to racial balance, pure and simple," are illegitimate. *Id.* at 726. The plurality goes on to ask how we differentiate between the benefits that flow from racial diversity and racial balance pure and simple. *Id.* My concern is that we will be unable to do so. For that reason, any plan for student diversity is faced with the threat of being held unconstitutional because we cannot compute the difference between racial diversity and racial balance.

Justice Kennedy, in his concurrence, endorses diversity as a compelling educational goal. *Id.* at 783. He joins in the judgment, however, because the school district plans for diversity in *Seattle* were directed at individual students, not at neighborhoods as is the case here. *Id.* at 782.

My concern is that the consideration of the racial composition of individual neighborhoods to determine school assignments may be just as problematic as the consideration of the race of individual students. Plan 3R does involve race: not the race of individuals but the racial balance of neighborhoods. An awareness of the racial make-up of the neighborhoods is a factor in the assignment plan. This

consideration of the racial composition of neighborhoods is, in my opinion, a parallel to the consideration of the race of the individual. It in effect brings consideration of race back into the formula.

Moreover, the plaintiffs contend that Plan 3R discriminated against them because it mandated their attendance at a particular high school on the basis of their race. Although they were not individually assigned to a school, the court did find that plaintiffs' race, through the racial composition of their neighborhoods, was a factor that was considered in determining their assignments. Furthermore, in making the Plan 3R assignments, the School District was attempting to improve on the racial diversity of its schools through its choice of the areas to be assigned to the high schools.

Nevertheless, I am convinced that, although racial diversity was an object of Plan 3R, it was not the racial composition of the neighborhoods that was the primary motive for the new assignment plan. I agree with the conclusion of the District Court, quoted above, that Plan 3R is narrowly tailored to meet race-neutral compelling interests and that it would have passed without a consideration of the racial make-up of the neighborhoods. All the same, race was a factor in the mix and diversity was a goal of Plan 3R. The conclusion I draw is that, when dealing with race-neutral compelling interests, the concurrent consideration of racial diversity (which of course must be race-based) does not invalidate a plan – but we need further guidance from the Supreme Court on this issue.

3

Finally, I believe that our decision in *Pryor v. National Collegiate Athletic Association*, 288 F.3d 548 (3d Cir. 2002), holding that "a law or policy that purposefully discriminates on account of race is presumptively invalid and can survive only if it withstands strict scrutiny review," *id.* at 566, supports my conclusion that strict scrutiny review is required here. Indeed, I believe that this panel should be bound by *Pryor*.

For the above reasons, I agree that we should affirm the judgment of the District Court but I conclude that we should do so using strict scrutiny review.